**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Michael E. PAULDINO, a/k/a Mike Parker, and Jess Raymond Bridwell, a/k/a Ray Bradley, Defendants-Appellants.**

Nos. 332-70, 333-70.

United States Court of Appeals, Tenth Circuit.

June 4, 1971.

Rehearings Denied July 1, 1971.

Charles F. Brega, Denver, Colo., for defendants-appellants.

James A. Clark, Sp. Asst. U. S. Atty., Denver, Colo., James L. Treece, U. S. Atty., Denver, Colo., for plaintiff-appellee.

Before BREITENSTEIN and HILL, Circuit Judges, and LANGLEY, District Judge.

HILL, Circuit Judge.

Appellants Bridwell and Pauldino were convicted by a jury on an indictment charging them with violating 18 U.S.C. § 1952 by traveling in interstate commerce to Nebraska with intent to participate in illegal gambling in the prohibited modes and with actual performance of those acts. Bridwell and Pauldino take this direct appeal from their respective convictions.

In brief, the evidence, taken as we must in the light most favorable to the prosecution,[1] shows that about November 2, 1966, appellants traveled from Colorado to Nebraska where they were joined by two individuals named Dan Abbott and Roy O'Neal. The group set out to contact one Ray Flanagan, a livestock dealer in Albion, Nebraska. Ini-

1. United States v. Mecham, 422 F.2d 838 (10th Cir. 1970); Collins v. United States, 383 F.2d 296 (10th Cir. 1967).

tially appellants, using alias names, engaged Flanagan in a discussion about buying livestock. Apparently, in no time the conversation turned to rolling dice to see who would buy some liquor so that the group could have a drink together.

There was a dispute in the testimony whether the dice were produced by someone in appellants' group or whether Flanagan had the dice on his desk in the sales barn. At any rate, that one roll of the dice led to a game of craps. Several hours later, Flanagan's wife discovered the game going on in the sales barn and at that point the parties retreated to appellants' motel room to continue shooting craps into the evening. At one point, one of Flanagan's friends joined the game, but upon quickly losing several hundred dollars, he dropped out. Predictably, when the day's activities were totalled up, Flanagan lost some $8,400.

The government also introduced evidence tending to show that appellants were engaged in gambling as a business enterprise and that their trip to Nebraska was made with intent to pursue this activity. In this respect, O'Neal testified for the government to the effect that he had called Bridwell in Colorado and asked him to come to Nebraska because they "might find some gambling or something." Furthermore, O'Neal stated that Bridwell gave him several hundred dollars of the money won off Flanagan for "calling him [Bridwell] up there."

There was also testimony from an FBI agent about an incident in 1966 wherein Pauldino described himself as a professional gambler. Another agent testified that as far back as 1953 Bridwell claimed that he made his livelihood from gambling. Several other witnesses took the stand to testify about appellants gambling activities just prior to and after the incident in Nebraska. Their testimony describes a craps game

in Nevada in September, 1966, wherein appellants won some $30,000; a blackjack game in an airplane between Seattle and Portland in May, 1966, wherein appellants won some $1,200; and a card game in Canada in November, 1967, where appellant Bridwell, operating alone, won a considerable sum. Finally, as evidence that appellants were engaged in gambling as a business, their respective 1966 income tax returns were entered into evidence because each appellant had therein described his occupation as "gambler".

Appellants primarily argue on appeal that the evidence was insufficient in three respects to prove a violation of 18 U.S.C. § 1952: (1) The evidence did not show a "business enterprise" as the term is defined in the statute; (2) the government failed to establish that appellants traveled interstate with the requisite intent; and (3) the evidence failed to establish that they conducted the unlawful activity in all of the prohibited modes listed conjunctively in the indictment.

On the question of whether there was evidence that appellants were involved in a gambling business enterprise, it must be noted that § 1952 makes it a crime to travel interstate to participate in unlawful activities, including gambling, only when those unlawful activities amount to a business enterprise. Obviously the anti-racketeering statute is not aimed at the fellow who, in a single instance, engages in gambling. Rather, the purpose of the statute is to get at those who engage in illegal gambling as a business and who utilize facilities of interstate commerce in furtherance of this business, thereby remaining effectively beyond the reach of state authorities.[2]

As we understand appellants' argument, they contend that under the language of § 1952 their activities in Nebraska alone must constitute a business enterprise in that state before a violation of the statute occurs. On this

---

2. United States Code, Cong. and Admin. News (1961), pp. 2664–7; *see* Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).

premise, appellants take refuge in the fact that the government's evidence only showed that they participated in one gambling incident in Nebraska, that being when they shot craps with Flanagan. Appellants conclude that proof of the lone incident does not show that they were involved in the business of gambling in Nebraska.

■ The reading of the statute which appellants propose is not supported by the cases they rely upon. In fact, no reported case has come to our attention which is authority directly on the issue posed. However, from the plain words of the statute, it is our determination that the government's evidence in this case was sufficient to prove a business enterprise within the purview of § 1952. Representative of the evidence establishing this were appellants' respective tax returns for 1966 which acknowledged gambling as each's occupation. In addition, there was a wealth of undisputed testimony concerning appellants' gambling forays across the country, even extending into Canada. Suffice it to say that it was well established that appellants' trip to Nebraska was not an isolated gambling incident but was just one more roll of the dice in their continuing effort to fleece the lambs of the land. Appellants' gambling was well within the clear meaning of a business enterprise involving gambling as that phrase is used in § 1952.[3]

■ Next appellants contend that the government failed to prove that they traveled to Nebraska with the requisite intent. The argument is that the evidence shows that appellants traveled to Nebraska in search of livestock to purchase, and the subsequent gambling was merely a spur of the moment thing which was not an immediate purpose of the trip. While there was evidence that when appellants first met Flanagan they talked to him about purchasing some

livestock, there was also testimony from O'Neal that O'Neal called Bridwell in Colorado and encouraged Bridwell to meet O'Neal in Nebraska to find some gambling. O'Neal's testimony also indicated that after the craps game with Flanagan, O'Neal received "courtesy money" from Bridwell as sort of a finder's fee for getting Bridwell into a game of craps. This evidence, together with the natural inferences that may be drawn therefrom, provided a sufficient basis for the jury to find that appellants traveled to Nebraska with the primary intent to engage in gambling as prohibited in § 1952.

■ Appellants also believe that the evidence was insufficient because the government's case did not prove every point in the indictment which charged appellants with traveling interstate "with intent to promote, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity." As is apparent, the indictment charged appellants in the conjunctive while the statute reads in the disjunctive. However we do not believe that the government's proof of some but perhaps not all of the prohibited modes of violating the statute constitutes a fatal defect in appellants' conviction. It is settled that where a crime denounced disjunctively in the statute is charged in the conjunctive, proof of any one of the allegations will sustain a conviction.[4]

· We now turn to appellants' contentions concerning the admissibility of certain evidence. First, appellants object that their respective tax returns for 1966 were admitted into evidence although there was no showing by the government that the government had complied with 26 C.F.R. § 301.6103(a)–1(h). The regulation in question governs the use of tax returns in litigation and requires that a United States Attor-

---

3. *Cf.* Spinelli v. United States, 382 F.2d 871 at 889 (8th Cir. 1967), rev'd on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

4. McGriff v. United States, 408 F.2d 333 (9th Cir. 1969); Rimerman v. United States, 374 F.2d 251 (8th Cir. 1967); Turf Center, Inc. v. United States, 325 F.2d 793 (9th Cir. 1963).

ney seeking to use a return in litigation not involving revenue laws shall make written application for the return or copies thereof with the Commissioner of Internal Revenue. Appellants urge that the government's failure to prove conformity with the regulation is fatal error.

We find no prejudicial error resulting from the government's use of the tax returns. Even assuming that in fact the application was not made in conformity with the regulation, it is difficult to say that for this reason alone the returns were not admissible as evidence. The regulation in question appears to be an administrative procedure and is in no way related to evidentiary rules governing the admissibility of evidence. The probative value of the returns as evidence in the courtroom is neither enhanced nor diminished by compliance with the regulation. We cannot conclude that otherwise admissible tax returns became inadmissible simply because the government did not bother to show in its case that, indeed, written application had been made to use the returns.

Appellants further argue that it was error to admit the returns into evidence because, according to appellants, the jury may have inferred tax evasion due to the fact that the income reported on their returns was at odds with the evidence of their gambling winnings in 1966. While it is true that in certain cases such as South v. United States, 368 F.2d 202 (5th Cir. 1968), evidence is inadmissible if it tends to prove an unrelated offense, this case does not fall into that category. In South v. United States, supra, tax returns were admitted in a § 1952 prosecution solely to show the accused's reported income. From the accused's nominal reported income, which was manifestly too small to live on, the government sought to argue that the accused must have had additional unreported income from illegal gambling

sources. The court in South, in a well reasoned opinion, determined that proof of the accused's meager reported income was probative of nothing related to the gambling offense in question. But the tax returns, coupled with the prosecutor's remarks, were highly suggestive of tax evasion although that was not an offense being tried.

Our case is in a significantly different posture. Beyond the fact that appellants did not object to the admission of the tax returns at trial, Bridwell and Pauldino's returns were admitted solely to show that on appellants' respective 1966 returns each claimed that his occupation was gambling. Income reported on their returns was not referred to at trial, and in fact the reported incomes on the exhibits were not insubstantial so as to immediately suggest tax evasion. In summary, the tax returns were probative evidence on the issues tried, and unlike the situation in South, no intimation was made to the jury that appellants were at least guilty of tax evasion. Hence it is unreasonable to assume that the jury improperly used the evidence in coming to their guilty verdict.

In a similar vein, appellants raise a question whether it was proper to admit the testimony concerning their gambling activities prior to and after their Nebraska trip. While, as we have indicated above, evidence of illegal activities other than the ones charged is not ordinarily admissible, there is an exception if the evidence establishes a course of conduct, scheme, design or intent.[5] In this regard, we think there is no question but that the evidence had probative value as proof that appellants were engaged in gambling as a continuous enterprise. The trial judge instructed the jury that they should consider the evidence only for resolving the question of whether appellants were engaged in gambling as a business. The evidence was properly admitted.[6]

5. Havelock v. United States, 427 F.2d 987 (10th Cir. 1970); United States v. Eagleston, 417 F.2d 11 (10th Cir. 1969).

6. *See* Collins v. United States, supra.

Tacking a different course, appellants also object to the testimony about their gambling activities outside Nebraska as contrary to the trial court's pre-trial order that neither appellant's criminal record should be brought out in the government's case. Appellants now contend that the evidence concerning their gambling activities outside Nebraska was tantamount to evidence of their prior criminal records. Appellants' contention is specious. The evidence in this case made no mention of appellants' criminal records, nor is this case comparable to cases where, for instance, mug shots were introduced which indirectly, if not directly, inferred the accused's previous trouble with the police. Our reading of the record discloses no subterfuge resorted to by the prosecution to inform the jury that appellants had police records.[7]

Further argument is made that it was error to admit the FBI agent's testimony that as far back as 1953 Bridwell was a gambler. Appellants urge that the remoteness in time from the charged offense negates the probative value of this evidence. If there be error in this respect, it staggers the imagination to believe that this bit of testimony in the course of the whole trial had any substantial influence on the jury's verdict. Only errors which affect substantial rights are prejudicial and require reversal.[8]

It is argued that the trial court erred in failing to grant appellants' motion for severance. As previously indicated, at trial the government produced extensive testimony concerning Bridwell's gambling activities in Canada. Pauldino was not involved in those activities, and he believes that nevertheless the jury may have considered that evidence as proof of his guilt. We are not persuaded by this argument. It is well settled that there is nothing per se improper about admitting evidence relating to one co-defendant but not relating to other co-defendants.[9] In view of the trial court's cautionary instruction that the evidence was applicable only to Bridwell and not applicable to Pauldino, we do not believe that its admission prejudiced Pauldino in the eyes of the jurors. The evidence was presented merely to establish Bridwell's gambling occupation and to support the other evidence that the trip to Nebraska was for the purpose of gambling and not for the purpose of buying livestock. There was already a wealth of evidence establishing the same facts concerning Pauldino. In sum we are not convinced this evidence was misused by the jurors and influenced them in reaching their verdict against Pauldino. Hence we can find no clear abuse of discretion in denying separate trials.

We now turn to the contention that there was no evidence that Pauldino traveled to Nebraska with intent to engage in gambling. Without question, there was no direct evidence proving either Bridwell or Pauldino's intent when they made the trip. However, the circumstances of O'Neal's call to Bridwell and the payoff to O'Neal are grounds to infer Bridwell's requisite intent. Further evidence connecting Pauldino with Bridwell in other gambling escapades, plus Pauldino's acknowledged sole occupation as a gambler, provides sufficient circumstantial evidence of Pauldino's intent in traveling to Nebraska. The conduct of Pauldino within a reasonable time before and after the trip are circumstances which the jury could rightly consider in determining intent, motive or purpose.[10]

Lastly, appellants submit that it was error to allow the witnesses who testified about the gambling episodes in

7. *Cf.* Dillon v. United States, 391 F.2d 433 (10th Cir. 1968).

8. Havelock v. United States, *supra.*

9. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); Dillon v. United States, *supra.*

10. Brooks v. United States, 309 F.2d 580 (10th Cir. 1962).

Washington and Canada to further testify that appellants cheated on those occasions. Appellants complain that the evidence of whether they cheated was irrelevant to the charge and highly prejudicial. Having closely read the record, we believe that the evidence of cheating on those occasions tied in with the testimony that in their game with Flanagan, appellants never bet against each other and would always bet against Flanagan and his friend. In short, the evidence showed all the more clearly that appellants were professional gamblers and that the Nebraska incident was just a typical episode in their larger effort to make a livelihood from illegal gambling throughout the country.

Affirmed.